**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:23-cr-150 (SVN) |
| | ) | |
| v. | ) | |
| | ) | |
| MARIANO IRIZARRY | ) | |
| | ) | |
| | ) | September 1, 2026 |

# ORDER

Sarala V. Nagala, United States District Judge.

In this criminal case based on a Title III wiretap, Defendant Mariano Irizarry is charged with conspiracy to possess with the intent to distribute 40 grams or more of fentanyl, heroin, and oxycodone in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi), 841(b)(1)(C), and 846 (Count One); and possession with intent to distribute and distribution of heroin and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Counts Three, Four, and Five). ECF No. 625 (Second Superseding Indictment).

Irizarry moves the Court for a *Franks* hearing and to suppress evidence procured from searches of a 2015 BMW sedan (the "BMW") on August 23, 2023, and 86 Woolsey Street in New Haven, Connecticut on August 31, 2023. Mot. to Suppress, ECF No. 920. Irizarry argues that the law enforcement affidavit supporting the application for these warrants is riddled with falsities and misleading omissions. In response, the Government argues: (1) that Irizarry lacks standing to challenge the 86 Woolsey Street search; and (2) that Irizarry does not make an adequate showing to justify a *Franks* hearing or to otherwise disturb the Magistrate Judge's probable cause findings.

For the reasons described below, the Court agrees with the Government. Irizarry's motion is DENIED in full, without the need for a *Franks* hearing.

## I. INFORMATION IN THE AFFIDAVIT

Beginning in approximately June of 2022, the FBI New Haven Safe Streets Gang Task Force (the "Task Force") began investigating an organization that was "trafficking street level quantities of fentanyl, crack cocaine, and Percocet in the New Haven, Connecticut area." Search Warrant Aff., ECF No. 920-2 ¶ 5 (the "Affidavit").[1] The Affiant was Officer Luke Rasile,[2] then a ten-year veteran of the East Haven, Connecticut, Police Department and a Task Force Officer with the FBI. *Id.* ¶ 2. Below, the Court summarizes the relevant events from that investigation as described in the Affidavit, which was submitted to U.S. Magistrate Judge Robert Spector on August 23, 2023.

### A. February 24, 2023, Controlled Narcotics Purchase

The probable cause section of the Affidavit opens with the following sentence: "Since June of 2022, members of the FBI New Haven Safe Streets Gang Task Force have been investigating the fentanyl trafficking of Mariano IRIZARRY, A.K.A. "Pops," and others in the New Haven, Connecticut Area." *Id.* ¶ 5. It then goes on to describe a controlled purchase of fentanyl that took place on February 24, 2023, portions of which were video- and audio-recorded. *Id.* ¶ 8.

As part of the drug trafficking investigation, the Task Force facilitated a controlled narcotics buy through a Confidential Source (the "CS") on February 24, 2023. *Id.* ¶ 6. Via telephone, the CS "made preliminary arrangements to purchase heroin with Fentanyl compound from" Irizarry's co-Defendant Kelvin Alvarado. *Id.* ¶ 7. The CS drove and picked Alvarado up; shortly thereafter, Alvarado called a person identified in the Affidavit as Alvarado's "Uncle," who

---

[1] The Affidavit, dated August 23, 2023, was submitted in support of applications for a criminal complaint and arrest warrant for Irizarry, as well as for searches of 739 Quinnipiac Avenue (Irizarry's girlfriend's residence, from which no items of evidentiary value were seized when the search was executed) and the BMW that was allegedly used by Irizarry during the course of the investigation. *See generally* ECF No. 920-2.

[2] Irizarry's counsel, Attorney Steven Rasile, has "some familial relationship" with Officer Rasile. *See* Govt's Opp. to Mot. to Dismiss, ECF No. 901 at 17, n.5. The Government represents that Attorney Rasile has stated that there is no conflict of interest in his representing Irizarry in this matter, despite this relationship. *Id.*

told Alvarado to go to the East Haven Quality Inn. *Id.* ¶ 9. At Alvarado's request, the CS stopped at a convenience store in New Haven on the way. *Id.* The Affidavit describes that the purpose of this stop was for Alvarado to pick up "cut," i.e., a cutting agent that is mixed with the drug. *Id.* Alvarado went into the store and then exited, and the Affidavit reports that the store did not have "cut," so Alvarado complained that they would have to make another stop after seeing his "Uncle." *Id.*

As they approached the Quality Inn parking lot, Alvarado called his "Uncle" to tell him they had arrived. *Id.* After an unknown male ("UM")—who was later identified to be Irizarry, according to the Affidavit—exited the Quality Inn, Alvarado exited CS's vehicle, and entered an Infiniti sedan parked in the lot. *Id.* The UM entered the same Infiniti. *Id.* After a "short time," the UM and Alvarado exited the Infiniti, and Alvarado returned to CS's vehicle. *Id.*

The CS then drove Alvarado to another convenience store on Ferry Street in New Haven, from which Alvarado obtained the "cut," according to the Affidavit. *Id.* Alvarado then directed the CS to drive to a McDonald's, where he picked up plastic cups. *Id.* Alvarado placed the suspected narcotics compound in one cup, and the "cut" into another before mixing them. *Id.* Alvarado then placed the cups and suspected narcotics in a black plastic bag, which he gave to CS. *Id.* The contents of the bag, which the Affidavit describes as having a "gross weight (with packaging) of approximately 87.5 grams, was field-tested with positive results for the presumptive presence of heroin with Fentanyl compound." *Id.* ¶ 12; *see also id.* ¶ 6.

B. <u>Law Enforcement Identification of Irizarry</u>

On February 27, 2023, Task Force investigators met with East Haven Police Department Detectives at the Quality Inn to review video footage dated February 24, 2023. *Id.* ¶ 13. Investigators observed "a male matching the physical description of IRIZARRY" walking through the interior of the hotel and the parking lot around the time of the controlled purchase. *Id.*

Investigators also observed video footage of Irizarry, and then Alvarado, entering a gray Infiniti sedan for a short time before exiting. *Id.* ¶ 14. The Quality Inn front desk employee confirmed that Irizarry had rented a room at the hotel from February 22, 2023, through February 23, 2023. *Id.* ¶ 15.

C. July 2, 2023, Narcotics Transaction

On July 2, 2023, the Task Force conducted surveillance in the area of 739 Quinnipiac Avenue. *Id.* ¶ 16. The BMW, bearing Connecticut registration AP01572, was parked in the rear lot. *Id.* Investigators observed Irizarry drive with his girlfriend, Vanessa Colon, to the East Haven Family Dollar Store, in the BMW . *Id.* ¶ 16. After Colon went into Family Dollar and returned to the car, Irizarry drove them to a laundromat in East Haven. *Id.* ¶ 17. Task Force members observed Irizarry taking a cellphone call while he and Colon entered the laundromat. *Id.* Irizarry exited the laundromat and returned to the BMW. *Id.* About a minute later, Colon re-entered the laundromat alone and a truck entered the lot, parking next to the BMW. *Id.* ¶ 18. An individual later identified as Charles May exited the truck and entered the passenger side of the BMW, where he appeared to "be looking around . . . as if acting as a look-out." *Id.* A few minutes later, May exited the BMW, reentered his truck, and left the laundromat. *Id.* ¶ 19. Surveillance vehicles followed May and ultimately identified him as the driver of the truck. *Id.* ¶ 20. May was not arrested, despite that he committed several traffic violations on his journey. *See id.* ¶ 19. Officer Rasile states in the Affidavit that he "believe[s] MAY and IRIZARRY had conducted a narcotics transaction inside the BMW" in front of the laundromat. *Id.* ¶ 21.

D. Trash Pulls at 739 Quinnipiac Avenue[3]

On August 4, 2023, Task Force members searched seven bags of trash at Vanessa Colon's residence, 739 Quinnipiac Avenue. *Id.* ¶ 22. Officers found the zip-loc tops of five plastic sandwich bags and two "Mannite Cicogna" labels. *Id.* at ¶¶ 22–23. Officer Rasile states that narcotics traffickers commonly (1) remove zip-loc tops and cut corners on sandwich bags to package small quantities of narcotics and (2) use Mannite Cicogna as a cutting agent for street distribution of drugs. *Id.* ¶¶ 23–24.

On August 11, 2023, Task Force members searched nine garbage bags from bins on the curb in front of 739 Quinnipiac Avenue. *Id.* ¶ 25. Within four of the bags, officers found the following:

- Trash Bag #1: A zip-loc top of a sandwich bag; part of a sandwich bag with cut corners; a piece of plain paper; and a piece of mail addressed to Colon. *Id.* ¶ 25.
- Trash Bag #2: Thirty zip-loc bags, two sandwich bags, and a plastic bag with a white powder-like residue; a zip-loc top of a sandwich bag; a plain piece of paper; two pieces of paper (one of which contained a white powder residue); and a piece of paper with the written message, "Shout me out on my page, 90-day I will be back" on one side, and "Love you, Queen B" on the other. *Id.* The two sandwich bags, one plastic bag, and piece of paper each "yielded a positive reaction for the probable presence of cocaine." *Id.* ¶ 26.
- Trash Bag #3: Three sandwich bags, one containing a white powder-like residue, and two zip-loc tops of sandwich bags. *Id.* ¶ 25. Two of the sandwich bags were field-tested, and the test was positive for the probable presence of cocaine. *Id.* ¶ 26.
- Trash Bag #4: One sandwich bag with a cut corner and one piece of mail addressed to Vanessa Colon. *Id.* ¶ 25.

[3] The Government submits that these trash pulls were included in the Affidavit to establish probable cause to search 739 Quinnipiac Avenue, from which no evidence ultimately was seized, and thus are less relevant to the probable cause determinations for 86 Woosley Street and the BMW. *See* Govt's Opp. Br., ECF No. 945 at 25. But as they were included in the probable cause section of Officer Rasile's affidavit, and the Government discusses them, the Court likewise describes them here.

On August 18, 2023, Task Force members searched eleven garbage bags from bins on the curb in front of 739 Quinnipiac Avenue. *Id.* ¶ 27. Officer Rasile's affidavit identifies the following from five bags:

- Trash Bag #1: Two zip-loc tops of sandwich bags. *Id.* ¶ 27.
- Trash Bag #2: Four sandwich bags, five zip-loc tops of sandwich bags, and one piece of paper addressed to Vanessa Colon-Reboyras. *Id.* ¶ 27. An officer field tested one of the four sandwich bags, which yielded a positive result for probable presence of heroin. *Id.* ¶ 28.
- Trash Bag #3: One piece of mail addressed to Vanessa Colon. *Id.* ¶ 27.
- Trash Bag #5: One sandwich bag, two pieces of paper, two small black rubber bands, one carton containing about 600 glassine wax folds, and one zip-loc top of a sandwich bag containing a white powder-like residue. *Id.* ¶ 27. An officer field tested the zip-loc top of a sandwich bag containing the white powder-like residue, which yielded positive for probable presence of cocaine. *Id.* ¶ 28.
- Trash Bag #9: Three sandwich bags, two zip-loc tops of a sandwich bag, two pieces of paper, one piece of mail addressed to Betzaida Reboyras at 739 Quinnipiac Avenue, 2nd Floor, one piece of mail addressed to Jessica Colon at 739 Quinnipiac Avenue, and one credit-card offer addressed to Donald E. Wimbush. *Id.* ¶ 27.

E. June 21, 2023, Surveillance

On June 21, 2023, Task Force members surveilled Irizarry, who was operating the BMW in the area of 86 Woosley Street in New Haven, the known address for Irizarry's co-Defendant Luis Sanchez-Vasquez. *Id.* ¶ 29. The Affidavit contains photographs from this surveillance. *Id.* ¶ 30.

Irizarry drove the BMW to 656 First Avenue in West Haven, where he went inside for about an hour before returning to the BMW. *Id.* Irizarry then drove to 739 Quinnipiac Avenue, where investigators observed Colon walk up the driveway from the street and out of view. *Id.* ¶ 30. Two minutes later, Irizarry drove the BMW to 86 Woolsey Street, where he exited the vehicle and walked towards James Street while using a cell phone. *Id.* Fifteen minutes later, Sanchez-Vasquez arrived on Woolsey Street and greeted Irizarry. *Id.* Irizarry then walked to the BMW,

opened the trunk, and "appeared to be manipulating items" therein "before concealing something in a blue plastic bag," closing the trunk, and walking out of view to the backyard at 86 Woolsey Street. *Id.* About six minutes later, Irizarry reemerged from the rear of 86 Woosley Street without the blue plastic bag and using a cell phone. *Id.* ¶ 31. Irizarry briefly entered and exited the BMW, then walked towards James Street. *Id.* He was later observed speaking with individuals around 170 James Street for forty minutes. *Id.*

At about 4:48 P.M., Task Force members observed Irizarry "appearing to conduct a hand-to-hand transaction" with an unknown person in front of 86 Woolsey Street. *Id.* ¶ 32. Two minutes later, Irizarry called Sanchez-Vasquez; the Title III wiretap interception indicates that Irizarry asked Sanchez-Vasquez if he could "Come in the back," and Sanchez-Vasquez confirms that "its open." *Id.* ¶ 33. At 4:55 P.M., Task Force members observed Defendant leave the backyard of 86 Woolsey Street to return to his BMW and drive away. *Id.* ¶ 34.

F. <u>August 21, 2023, Hand-to-Hand Transaction</u>

On August 21, 2023, a Task Force member observed a black BMW sedan matching the description of Irizarry's vehicle in the driveway at 505 Laurel Street in East Haven. *Id.* ¶ 35. The Task Force member observed Irizarry using both hands to exchange items with an unknown male near the trunk of the BMW for "less than two (2) seconds," and then turn around to return to the BMW. *Id.* ¶ 35. The Task Force Member assessed this activity as "consistent with a hand-to-hand narcotics transaction." *Id.* ¶ 35.

G. <u>The Search Warrants</u>

Based on the above-summarized information, Magistrate Judge Robert M. Spector authorized search warrants for the residence of Vanessa Colon, 739 Quinnipiac Avenue in New Haven, Connecticut, and for the BMW. ECF No. 920-2 at 28–34 (dated August 23, 2023). In the

present motion, Irizarry moves to suppress evidence seized from the 2015 BMW. *See* ECF No. 920-1 at 6.

The above-summarized information was also incorporated into affidavits supporting the application for two additional search warrants. The first was for the residence of Irizarry's associate, Luis Sanchez-Vasquez, the first floor of 86 Woolsey Street in New Haven, Connecticut. ECF No. 920-7 at 26–28. The second, applied for later the same day, was for the basement at 86 Woolsey Street. ECF No. 920-8. Irizarry previously moved to suppress the evidence seized in the basement at 86 Woolsey Street, and the Court denied his motion. *See* Order, ECF No. 976. To the extent he renews his motion to suppress evidence seized at 86 Woolsey Street in the present motion, the Court concludes below that Irizarry lacks standing to challenge the search warrants for 86 Woosley Street. Thus, the Court does not summarize additional information set out in the affidavits supporting those warrant applications.

## II. LEGAL STANDARD

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. In general, law enforcement "must obtain a warrant before they enter the home to conduct a search or otherwise intrude on an individual's legitimate expectation of privacy." *United States v. Gori*, 230 F.3d 44, 49 (2d Cir. 2000) (citing *Maryland v. Dyson*, 527 U.S. 465, 466 (1999)). In deciding this motion, the key questions before the Court are (1) whether Defendant's Fourth Amendment rights are implicated by the 86 Woolsey Street searches, such that he has standing to challenge them; and (2) whether the warrant for the BMW was issued upon a finding of "probable cause, supported by Oath or affirmation . . . ." U.S. Const. amend. IV.

A. Standing

A defendant seeking to suppress evidence seized in a government search must have a "reasonable expectation of freedom from governmental intrusion" in the area that was searched. *Mancusi v. DeForte*, 392 U.S. 364, 368 (1968). This requires the defendant to demonstrate that he has "a subjective expectation of privacy in a searched place or item" and that his expectation is reasonable. *United States v. Chuang*, 897 F.2d 646, 649 (2d Cir. 1990). A defendant may "claim a legitimate expectation of privacy in a dwelling other than his own" if "the host has so liberally shared his own privacy interest with his guest that it shelters the guest against unreasonable government intrusion." *Figueroa v. Mazza*, 825 F.3d 89, 109 (2d Cir. 2016).

B. Probable Cause

Probable cause is a "fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts" and is not "readily . . . reduced to a neat set of legal rules." *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)) (cleaned up). Probable cause for a search exists "where the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007)) (cleaned up). A reviewing court "must accord considerable deference to the probable cause determination" of a neutral and detached magistrate judge. *Clark*, 638 F.3d at 93 (quoting *Walczyk*, 496 F.3d at 157). A reviewing court's task "is simply to ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination." *Id.* (quoting *Gates*, 462 U.S. at 238).

"[A] search pursuant to a warrant issued by a judicial officer upon a finding of probable cause is presumptively reasonable." *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (citing *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)). However, that presumption "can

be defeated by showing that the government (1) knowingly and deliberately, or with a reckless disregard of the truth, procured the warrant, (2) based on false statements or material omissions, that (3) were necessary to the finding of probable cause." *Id.* (quoting *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994)) (cleaned up); *see also United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000) ("A defendant is permitted to challenge the veracity of a search warrant in limited circumstances," such as "where the affidavit in support of the search warrant is alleged to contain deliberately or recklessly false or misleading information."). The Court determines whether a false statement was necessary to a finding of probable cause by considering a "hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information." *Ganek*, 874 F.3d at 82. "If probable cause is lacking after such correction, then the false statement was 'necessary' to secure issuance of the warrant." *Id.* "On the other hand, 'if probable cause remains' after the warrant is corrected," there has been no violation of the defendant's Fourth Amendment rights. *Id.* (quoting *Smith v. Edwards*, 175 F.3d 99, 105 (2d Cir. 1999)).

C. *Franks* Hearing

Irizarry also requests an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Under *Franks*, "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 155–56. A defendant may challenge both materially misleading omissions and misrepresentations as the basis for a *Franks* hearing. *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). But "[t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-

examine." *Franks*, 438 U.S. at 171. "There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id.* Finally, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.* at 171–72. Likewise, if probable cause still exists to issue the warrant based on the hypothetical corrected affidavit, the Court must deny Defendant's motion to suppress. *See United States v. Frazier*, No. 3:19-CR-307 (SRU), 2020 WL 6263312, at *2 (D. Conn. Oct. 23, 2020).

D. Good Faith Exception

If probable cause does not exist to issue the warrant based on the hypothetical corrected affidavit, the Court must next determine whether the "good faith exception" applies. *Id.* Even if probable cause does not exist, evidence may avoid exclusion if it was "'obtained in objectively reasonable reliance on a subsequently invalidated search warrant.'" *Clark*, 638 F.3d at 99 (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). The burden is on the government to show that the good faith exception applies. *Id.* at 100. It does not apply: "(1) where the issuing magistrate judge has been knowingly misled; (2) where the issuing magistrate judge wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance on it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *Id.* (quoting *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992)).

E. In Sum

In sum, the Court must assess each statement/omission Irizarry challenges for: (1) falsity, to determine whether the statement was false (or an omission misleading); (2) knowledge, that the affiant made or omitted the statement knowingly or with reckless disregard; and (3) materiality, that the allegedly false statement is necessary to a probable cause finding. *See United States v.*

*Rumph*, 754 F. Supp. 3d 417, 430 (S.D.N.Y. 2024). The burden is on Irizarry to prove these elements. *Id.*

## III. DISCUSSION

### A. Irizarry Lacks Standing to Challenge the 86 Woolsey Street Warrant

In deciding Irizarry's first motion to suppress, the Court determined that he lacks standing to challenge the searches at 86 Woolsey Street. Order, ECF No. 976. As explained in that decision, Irizarry does not aver facts showing that any resident of the first floor of 86 Woolsey (the original search location) extended their right to privacy to Irizarry as a guest. *Id.* Nor does he make any additional factual showing that he had a legitimate expectation of privacy in either the first floor or the basement of that location as part of this motion. Thus, Irizarry's motion to suppress all evidence seized at 86 Woolsey Street is denied, and the Court does not address his arguments related to the affidavits that supported the searches at 86 Woolsey Street.

### B. 2015 BMW Search Warrant Statements

The Government does not contest Irizarry's standing to challenge the search of the BMW so the Court assumes, for purposes of assessing this motion to suppress, that Irizarry has such standing.

Irizarry argues that a laundry list of intentional omissions and falsities rendered the affidavit in support of the 2015 BMW search warrant application misleading. As an initial matter, the Court finds the organization of Irizarry's motion to be difficult to follow, in that it appears to categorize the alleged misrepresentations and misleading omissions by source of evidence, rather than by clearly identifying the challenged statements themselves. The Court assesses each statement or omission that it can identify from Irizarry's convoluted filing in turn to determine whether such statement or omission should be struck from (or in the case of omissions, added to) the hypothetical affidavit. The Court finds that all of Irizarry's allegations of deliberate falsehood

or reckless disregard for the truth are either insufficiently specific or not accompanied by adequate offerings of proof of falsity. It then briefly discusses the materiality of the statements and omissions, in the context of assessing a "hypothetical" affidavit in which the statements are excluded and the omissions are included.

*1. The Investigation Timeline*

First, the Court concludes that the prefatory sentence of the probable cause section of the Affidavit setting forth the investigative timeline was not false, but was inartfully worded.

Irizarry argues that Officer Rasile intentionally misled the Court by stating, in the opening sentence of the "Probable Cause" section of the warrant affidavit: "Since June of 2022, members of the FBI New Haven Safe Streets Gang Task Force have been investigating the fentanyl trafficking of Mariano IRIZARRY, A.K.A. "Pops," and others in the New Haven area." ECF No. 920-1 at 6; ECF No. 920-2 ¶ 5. Irizarry states that from June 6, 2022, through February 23, 2023, the Government facilitated nine controlled narcotics purchases through the CS, "none of which involved Irizarry." ECF No. 920-1 at 7–8 (citing transactions documented in indictments). Thus, Irizarry contends that, to the extent the sentence at issue suggested that the investigation into Irizarry began as early as June of 2022, it is a false statement. In response, the Government does not point to information suggesting that Irizarry was in fact a subject of the Task Force's investigation prior to February 23, 2023, and concedes that the controlled transactions from June 6, 2022, through February 23, 2023 "do not involve" Irizarry. ECF No. 945 at 13. Nevertheless, the Government argues that because Officer Rasile stated that the Task Force had been investigating the fentanyl trafficking of Irizarry "*and others*," since June 6, 2022, the statement is true, in that it reflects the parts of the investigation that concerned other people. *Id.*

The Court finds that this statement is, at best, inartfully worded, but does not constitute a false statement. As the Government correctly notes, the sentence is prefatory, and was intended

to give a brief temporal overview of the Government's investigation into the fentanyl trafficking of Irizarry *and others*. While Irizarry is technically correct that the investigation into him appears to have begun in earnest in February of 2023 and the Government has proffered no argument that its investigation concerned Irizarry as early as June of 2022, the Court cannot find that this statement is false, in that it can fairly be read to suggest that the investigation into the fentanyl trafficking of Irizarry *and others* began in June of 2022. At best, the sentence was not carefully worded, but the Court does not go so far as to find that it is false. In any event, given that this sentence was prefatory in nature and the remainder of the probable cause section of the affidavit describes law enforcement's investigation of Irizarry beginning in February of 2023, the Court cannot find that the statement was made with knowledge of its falsity or reckless disregard for the truth. For instance, the Affidavit does not suggest in any other place that Irizarry was involved in narcotics trafficking as early as June of 2022. Nor was it material to the magistrate judge's probable cause determination, given that it was simply prefatory and the bulk of the affidavit discusses Irizarry's activities after February 2023, which independently establish probable cause to search the BMW.

2. *Omission of Alvarado's Other Drug Suppliers*

Next, the Court concludes that the Affidavit is not misleading in its omission of discussions about Alvarado's other drug transactions and sources of supply. *See* ECF No. 920 at 7–9, 11–14.

As the Second Circuit has cautioned, "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (quoting *United States v. Awadallah*, 349 F.3d 42, 67–68 (2d Cir. 2003)). And not every decision to exclude information from an affidavit is an "intentional" omission recognized as problematic by *Franks*: *Franks* protects against "omissions that are *designed to mislead*" or that are "made in *reckless disregard of whether they would*

*mislead*[] the magistrate." *Awadallah*, 349 F.3d at 68 (quoting *United States v. Colkley*, 899 F.2d 297, 300–01 (4th Cir. 1990)). *Rajaratnam* recognized that reckless disregard can "sometimes be *inferred*" based on how critical the omitted information is to the warrant application, but the inference "is not to be automatically drawn simply because a reasonable person would have included the omitted information." *Rajaratnam*, 71 F.3d at 154; *see also Rivera*, 928 F.2d at 604 ("Recklessness may be inferred where the omitted information was 'clearly critical' to the probable cause determination.").

Irizarry fails to explain how or why Alvarado's other transactions are relevant to the finding that there was probable cause to believe Irizarry was involved in trafficking narcotics and that evidence of this crime would found in the BMW. The affidavit does not state or suggest that Irizarry was Alvarado's exclusive source of drugs—it chiefly focuses on the one transaction at the Quality Inn in which law enforcement identified Irizarry through surveillance and investigation at the hotel. Thus, the Court therefore cannot infer that the omissions reflect a reckless disregard for the truth (and were not material).

First, Irizarry points to omitted wiretap interceptions suggesting that Alvarado had another source of supply on February 23, 2023, the day before the narcotics transaction allegedly involving Irizarry at the Quality Inn. On that day, Alvarado spoke with an incarcerated individual, to obtain a phone number for someone named "Vont," and then spoke with "Vont" directly later that day. ECF No. 920-1 at 10; ECF No. 920-3 at 2, 8–10. Thus, Irizarry argues that Vont "was a source of supply for Alvarado to obtain drugs." ECF No. 920-1 at 10. Relatedly, Irizarry highlights that the next day, Alvarado called an unknown individual and said "Aight so McDonald's in East Haven so hop on the highway—" before he was cut off by voicemail. ECF No. 920-3 at 5. The

Government does not directly respond, but does state that it "does not dispute" the assertion that "Alvarado was attempting to obtain drugs from multiple sources." ECF No. 945 at 19.

With respect to the calls concerning "Vont," the Court finds that the linesheet reports do not support Irizarry's position. First, Irizarry is incorrect that Alvarado called the inmate to get Vont's phone number. The report states the reverse: "*Alvarado* then tells [the inmate] to take down 'Vont' number." ECF No. 920-3 at 2 (emphasis added). Second, although it appears that Alvarado spoke with Vont later on February 23, 2023, the conversation is about car troubles. ECF No. 920-3 at 8–10. And with respect to all three of the three calls, Defendant fails to articulate why any of them belong in the 2015 BMW search warrant application, given that the Affidavit focuses on the event where law enforcement saw Alvarado and Irizarry in the same vehicle at the Quality Inn (and later evidence suggesting Irizarry had engaged in hand-to-hand narcotics transactions from or near the BMW). Accordingly, the Court sees no reason why the omissions are "clearly critical" to the probable cause determination. Irizarry therefore fails to make a showing that Officer Rasile omitted this information deliberately or with reckless disregard.

Irizarry also calls attention to Alvarado's call to an unknown male on February 24, 2023, "asking for what appears to be a quantity of narcotics, as Alvarado iterates 'Fifty-two, zero, two. Fifty-one zero [UI].'" ECF No. 920-1 at 10 (citing ECF No. 920-3 at 4). Irizarry argues that this "appears to align directly with the quantity the Government alleges was involved." *Id.* But the Government convincingly argues that it is uncommon for drug dealers to make drug orders by voicemail; the numbers Alvarado is saying closely correspond with the last four digits of the number he called (5102), so it is more likely that he called the wrong number and was saying the number he intended to call out loud to himself; and that the phone call occurred *after* Alvarado met with Irizarry. Moreover, the Government concluded this call was non-pertinent, suggesting

that it did not deem the call relevant to the drug investigation. Irizarry has offered no reply to these points.

Here again, Irizarry fails to show that this information was omitted deliberately or with reckless disregard. Although Irizarry states that the numbers Alvarado recited in the message align with the quantity of drugs at issue, this is a stretch, as Irizarry himself states that the weight of the drug compound was 54.3 grams—not 52.02 or 51.02, the numbers recited in the intercepted phone call. ECF No. 920-1 at 17. Additionally, the Court cannot conclude that Officer Rasile made a false statement by omission by omitting ambiguous information subject to multiple interpretations. Indeed, investigators deemed this phone call non-pertinent, evincing a state of mind at the time that the call was not significant to the investigation. *See Rajaratnam*, 719 F.3d at 156 (examining the states of mind of relevant investigators at the time the affidavit was submitted to determine whether the information was omitted with reckless disregard for the truth). Thus, at best, the failure to include it would have been negligent, and not deliberate. *Id.* at 155 (an inference of reckless disregard "is particularly inappropriate where the government comes forward with evidence indicating that the omission resulted from nothing more than negligence"). Finally, given its ambiguity, this phone call cannot have been "clearly critical" to the probable cause finding when its import is not clear, such that a finding of recklessness can be inferred. And this call itself adds nothing (and does not detract from) Judge Spector's probable cause determination, in any event.

*3. Omission of Additional Calls Related to February 28, 2023, Controlled Purchase*

Nor were other wiretap calls that appear to relate to the February 24, 2023, controlled purchase deliberately or recklessly omitted.

Irizarry argues that Officer Rasile's omission of various calls occurring on February 23–24, 2023, was intended to "mislead the Court into believing there was more conduct than there really was for probable cause." ECF No. 920-1 at 14. In support of this argument, Irizarry points to twelve other calls.

On February 23, 2023, Alvarado and the CS spoke on the phone to confirm the intended drug deal the next day. ECF No. 920-1 at 11 (citing Session #117, ECF No. 920-4 at 1). Alvarado says "Imma make the call right now," and a minute after concluding his call(s) with the CS, Alvarado calls Defendant Bramwell and orders "Twenty-Five." *Id.* at 11–12 (citing 920-4 at 1; citing Session #137, ECF No. 920-4 at 4). When Alvardo asked Bramwell if he (Bramwell) would be "ready for me," Bramwell responded: "Yeah." ECF No. 920-4 at 4.

Then, on February 24, 2023, after Alvarado and CS spoke on the phone to once again confirm the drug deal that day, Alvarado called a number the Government associates with Irizarry ("the 475 number"), but no one answered. ECF No. 920-1 at 12 (citing Session #170, ECF No. 920-4 at 5). About eight minutes later, Alvarado called another phone number and says "Ayo listen, I need 25." *Id.* (citing ECF No. Session #218, ECF No. 920-4 at 7). And less than a minute after that, Alvarado called yet another unidentified male, said he "need[s] 25," and the unidentified male offered to "grab it." *Id.* at 12–13 (citing Session #231, ECF No. 920-4 at 8). Irizarry also points out that there is a second linesheet with the exact same conversation, this time labeled as associated with himself and the 475 number. *Id.* at 13 (citing Session #232, ECF No. 920-4 at 9).[4]

Thereafter, the 475 number that the Government attributes to Irizarry called Alvarado, apparently to confirm pickup. *Id.*[5] Then, Alvarado calls Bramwell and—among other things—

[4] The Government appears to believe that both Sessions #231 and 232 reflect the same conversation, between Alvarado and Irizarry. *See* ECF No. 945 at 19.

[5] Irizarry does not cite to a particular linesheet session, but the Court assumes for purposes of this analysis that his representation of this call is accurate.

states that he is "not dealing with ['Pop'] I told you that the last time I grabbed it from [Pop] it wasn't good." *Id.* (citing Session #236, ECF No. 920-4 at 10). Bramwell discusses that Alvarado had "told [Brmawell] to go get it," and he (Bramwell) "went to go get it," and that Bramwell is "not waiting around bro it's hot riding around with this shit. It ain't nothing." ECF No. 920-4 at 10. Five minutes later, Alvarado receives yet another incoming call, ostensibly from Irizarry at the 475 number, stating he "is ready for" Alvarado "on facts," but would let Alvarado know the location where they would meet. ECF No. 920-1 at 14 (citing Session #250, ECF No. 920-4 at 11). Then, a few calls occur between Alvarado and the individual using the 475 number to confirm meeting at the Quality Inn in East Haven. *Id.* (citing Sessions #256, 260, 262, ECF No. 920-4 at 13–15).

The Government acknowledges that Alvarado apparently "attempted to obtain drugs from multiple sources," but reiterates that Alvarado confirmed and met only with Irizarry on February 24, 2023, for the controlled buy. ECF No. 945 at 19–20. The omitted calls occurring around the time of the February 24 controlled purchase—which could chip away at the likelihood that Irizarry served as Alvarado's narcotics source for the transaction—present a closer call than some of the other communications Irizarry contests. But the Affidavit details the February 24th transaction primarily through the lens of the CS's interactions with Alvarado, the resulting surveillance, and the investigation of Irizarry's presence at the hotel. *See* ECF No. 920-2 at 4–6. It does not discuss any calls (to Irizarry or otherwise) regarding Alvarado's sourcing for the transaction. *Id.* In other words, the Affidavit does not selectively present calls Alvarado made to potential sources, such that it describes only calls that might inculpate Irizarry while omitting ones that discuss other potential sources of supply. It simply excludes wiretap interceptions from the scope of the affidavit altogether and focuses on the person with whom Alvarado met just before selling the fentanyl

compound to the CS—which was sufficient to establish probable cause to search the BMW, when considered in combination with the other evidence described in the Affidavit. This approach is not indicative of deliberate omission or reckless disregard for the truth. Thus, here, too, Defendant falls short of a sufficient showing of falsity and materiality.

Irizarry also protests the omission of yet three more calls on February 24, 2023, concerning possible drug deals Alvarado facilitated with other buyers that day, ECF No. 920-1 at 14–15, but his arguments as to these calls are likewise unavailing. Irizarry argues that these calls show Alvarado "had a lot more drugs at his disposal on February 24, 2023, than those allegedly purchased at the Quality Inn earlier that same date," including "yellow pills." *Id.* at 15 (citing Session, #299, ECF No. 920-4 at 19). The Government responds with two arguments: first, even if Irizarry is correct, Alvarado's possession of any drugs other than fentanyl is irrelevant; and second, at least one of the calls does not support Irizarry's point. ECF No. 945 at 20. At the outset, the Government is correct that the most straightforward reading of the last-cited call concerning yellow pills is not that Alvarado definitively possessed such pills but, rather, that someone accused Alvarado of providing pills to "his brother," and Alvarado denied it. *See* ECF No. 920-4 at 19. Regardless, Irizarry again fails to show that any of these omissions were "clearly critical" to the probable cause finding.[6] None of these communications indicate that Alvarado possessed excess fentanyl on February 24, 2023. Therefore, none impact the Affidavit's account of the controlled buy: Alvarado apparently did not have fentanyl to sell to the CS; the CS drove Alvarado to the Quality Inn, where Alvarado's source had directed they should meet; Alvarado met with Irizarry; and Alvarado then sold heroin with fentanyl compound to the CS.

---

[6] Throughout Defendant's motion, he cites to linesheet session numbers rather than identifying the corresponding exhibit and page number. Based on the Court's review, Defendant did not include sessions 268 and 282 in his exhibits to the motion. *See* ECF No. 920-1 at 14–15 (citing sessions 268 and 282). Accordingly, the Court's determination with respect to these two sessions is based upon quotations Defendant provides in his motion.

The Court therefore concludes that Officer Rasile did not mislead Magistrate Judge Spector by omitting these calls concerning Alvarado's other potential narcotics activity on February 23, 2023, from the Affidavit.

*4. Omission of Information about Relationship between CS and Alvarado*

The Affidavit also did not intentionally or recklessly omit mention of the "important non-drug relationship" between Alvarado and the CS, which Irizarry claims "shows an alternate reason" they are together. ECF No. 920-1 at 11.

Irizarry contends that the CS and Alvarado repeatedly communicate regarding Alvarado's car troubles, and the CS used Alvarado's phone to call a third party who likely sold the car to Alvarado. *Id.* (citing Sessions #306, 375, 266, ECF No. 920-3 at 3, 6–7, 11). The Government responds that the FBI introduced the CS to Alvarado, and that "[a]ny discussions the two have that are not explicitly about drugs serves the purpose of further ingratiating the CS to Alvarado in order to strengthen the drug relationship and build trust, or . . . to just pass the time." ECF No. 945 at 17.

The Court does not find that this omission is misleading. As with the omission of Alvarado's transactions that did not involve Irizarry, Irizarry does not sufficiently demonstrate why friendly conversation/coordination between CS and Alvarado about his car would be "clearly critical" to the magistrate judge's probable cause finding, and therefore it cannot be the case that Officer Rasile omitted this information with knowledge of its falsity or with reckless disregard for the truth.

*5. The Controlled Buy Videos*

The Court next rejects Irizarry's arguments concerning the controlled purchase and the video of it. Irizarry argues that Officer Rasile's affidavit includes four false statements regarding

the controlled buy with CS, and omits a comment from an important call that the CS made to agents. ECF No. 920-1 at 15–16. The Court separately evaluates the statements and omission.

The first statement is about CS and Alvarado's stop at a store on Farren Avenue. The Affidavit states that "[a]ccording to CS-1, Alvarado wanted to stop at a convenience store to obtain 'cut' prior to meeting with his 'Uncle.'" ECF No. 920-2 ¶ 9. But Irizarry insists that Alvarado asked to "stop at this store real quick" without any mention of "cut," leaving open the possibility that Alvarado purchased the *narcotics* at the Farren Avenue store, and was not seeking to obtain cut there. ECF No. 920-1 at 15–16. The Government does specifically address this statement, but generally argues that "[i]n context, it is clear that Alvarado went to obtain cut from the store." ECF No. 945 at 21.

Importantly, in the Affidavit, Officer Rasile prefaces this challenged statement with: "according to CS-1. . . " ECF No. 920-2 ¶ 9. The Affidavit does not indicate that CS's assessment was based solely on his discussions with Alvarado in the car on February 24, 2023. And as Irizarry himself points out, Alvarado and CS had been in regular contact about the drug deal and various other topics before the controlled buy. ECF No. 920-1 at 11. In short, the video does not reflect the entirety of how the CS may have concluded that Alvarado went into the store to obtain cut. Especially in light of the CS's cooperative role with the Task Force, and the surrounding circumstances articulated by the Government that support the Affidavit's account, *see* ECF No. 945 at 21–22, Irizarry does not demonstrate that the CS's assessment was false, or that Officer Rasile acted with reckless disregard for the truth in relying upon it.

Second, Irizarry points out that when Alvarado exits the vehicle to enter the store, the CS called a Task Force agent to inform them "I think he went to get the shit," ECF No. 920-1 at 15, which Irizarry argues tends to show that Alvarado went there for narcotics, not cut. *Id.* at 15–16.

But the Government argues: (1) the agent the CS spoke to "understands 'the shit' to mean 'cut,'" and even says "cut" during the call; (2) the CS asks the agent during the call to ensure that there are no East Haven cops at the Quality Inn, anticipating the narcotics transaction would occur there, not at the store; and (3) Alvarado could not have purchased fentanyl at this store because the CS had not yet paid Alvarado. ECF No. 945 at 21–22. These observations support the Affidavit's statement that the CS believed Alvarado was looking to obtain cut at the store, rather than fentanyl. Again, Irizarry's capacity to develop another account of the conduct described in the Affidavit is not sufficient to show that Officer Rasile deliberately lied or acted with reckless disregard for the truth. *See United States v. Sandalo*, 70 F.4th 77, 88 (2d Cir. 2023) (lack of information corroborating statements in affidavit "does not show that [the officer's] professed observations were false or that they were included in the affidavit with knowledge of their falsity or reckless disregard for truthfulness").

In the same vein, Irizarry protests a third statement, that Alvarado never "informed CS-1 that the store did not have the 'cut,' so they would need to stop after they met with his 'Uncle.'" ECF No. 920-2 ¶ 9; ECF No. 920-1 at 16. The Government responds that Alvarado expresses to the CS that he did not get what he wanted from the store when he states: "I'm mad as fuck bro. [U/I] We have to stop at the store when we come back." ECF No. 945 at 22. This statement at least implicitly contradicts Irizarry's assertion that there is no discussion about obtaining cut from another store. *See* ECF No. 920-1 at 16. Although Alvarado does not use the word "cut" explicitly, it appears clear from the context—including that Alvarado mixes the suspected narcotics with the "cut" after the stops at the Ferry Street store and McDonald's to obtain cups—that getting the "cut" from the Ferry Street store was the purpose of that stop. Irizarry's alternative interpretation of this

evidence—*i.e.*, that Alvarado was informing CS that he was unable to pick up something *other* than cut—again, is not indicative of falsity on the affiant's part.

Fourth, Irizarry argues that Alvarado never indicated a reason for stopping at the Ferry Street convenience store after going to the Quality Inn, contrary to the Affidavit's statement that "Alvarado obtained the 'cut' from this convenience store . . . " ECF No. 920-2 ¶ 9. The Government does not specifically address this statement but, again, a lack of proof specifically corroborating the affiant's assertion does not show falsity. And the fact that Alvarado does not clearly narrate his every action throughout the process of the controlled buy is not a sufficient showing for falsity or knowledge, particularly given the affiant's discussion with the CS about "cut" while Alvarado was in the first store. It appears Officer Rasile inferred that Alvarado had obtained the cut from the second store, given what his investigation—including his conversations with the CS—had revealed. Irizarry has not mustered any proof that the inference was demonstrably false or intentionally misleading.

Fifth and finally, Irizarry states that when Alvarado exits the Ferry Street convenience store, he does not have cut, contrary to the Affidavit's assertion. Instead, for the first time, Alvarado has "a black bag that the alleged narcotics were seized in." ECF No. 920-1 at 16 (citing Exhibit 1B126). But both parties agree that the Affidavit describes Alvarado creating a compound with narcotics and additive "cut." *See id.* at 16; ECF No. 945 at 22. Thus, the fact that Alvarado exited the Ferry Street store simply shows that Alvarado got the bag that he eventually placed the drug compound in from that store—not necessarily that narcotics were in the bag when Alvarado left the Ferry Street store. Accordingly, Irizarry does not make an adequate showing of falsity.

*6. Calls to Alvarado's "Uncle"*

Further, the Court cannot find that the Affidavit's references to Irizarry as Alvarado's "Uncle" were false or misleading.

The Affidavit states that Alvarado says he is speaking to his "Uncle" when he calls the 475 number on February 23, 2023. ECF No. 920-2 ¶ 9. Irizarry points out that he is not Alvarado's uncle, that Alvarado speaks to another unknown male who he calls his "uncle" later that day, and that Alvarado refers to his uncle in yet another call. ECF No. 920-1 at 17 (citing Sessions # 316 and 328).[7] Irizarry argues that the Affidavit implies that Irizarry *is* Alvarado's uncle, to "make[] it seem like [Irizarry] was the person" who directed Alvarado to the Quality Inn to "obtain the alleged narcotics." *Id.* (citing ECF No. 920-2 at 4 ¶ 9).

Although the Court does not fully understand Irizarry's argument on this point, to be clear, it does not perceive the Affidavit as implying that Irizarry is, in fact, Alvarado's actual uncle—*i.e.*, one of his parents' siblings. The Affidavit places the term "Uncle" in scare quotes,[8] which denotes its use in a nonstandard, nonliteral manner. *See* ECF No. 920-2 ¶ 9. And as the Government acknowledges, "uncle" is a common term for someone to use about an older, respected individual. ECF No. 945 at 22. Finally, the controlled buy video confirms that Alvarado refers to Irizarry using this term. Def.'s Ex. D1 at 2:25 (referencing that a person in the Quality Inn parking lot is his "uncle right there"). Officer Rasile therefore did not knowingly or recklessly make a false statement in stating that Alvarado had called Irizarry his "Uncle."

7. *Quantity of Narcotics Compound*

Next, the Affidavit did not contain a false statement about the quantity of the narcotics compound purchased.

The Affidavit states that the FBI purchased "87.5 grams of heroin with fentanyl compound, *including packaging*" from Alvarado, ECF No. 920-2 ¶¶ 6, 12 (emphasis added), and Irizarry

---

[7] Here, again, the Court relies on Irizarry's characterizations of these calls in the absence of the inclusion of these linesheets as exhibits to the motion. *See supra* n.1.

[8] *See generally Scare Quotes*, University of Sussex, https://www.sussex.ac.uk/informatics/punctuation/quotes/scare (last visited Aug. 31, 2026).

argues that the net weight of the narcotics compound was 54.3 grams. ECF No. 920-1 at 17–18. The Affidavit explicitly states that it is reporting the weight of the substances *and packaging*, which included a shopping bag and two plastic cups, ECF No. 945 at 24, which explains the discrepancy between the net weight of the substances in the lab report and the Affidavit's statement of quantity. Here, again, Irizarry fails to show falsity. And even if he had, the possession of *any* redistributable quantity of fentanyl with intent to distribute it constitutes a federal crime, so Irizarry's quibble about the quantity would not have affected the first part of the magistrate judge's probable cause determination: that a crime had been committed.

*8. The 739 Quinnipiac Avenue Trash Pulls*

The Affidavit's statements concerning the items culled from trash pulls at 739 Quinnipiac Avenue likewise were not false or misleading. Irizarry argues that because the trash bins were shared (*i.e.*, not exclusive to Bramwell and his associates), the Affidavit's description of the items "infers more than what is really there." ECF No. 920-1 at 20. Notably, Irizarry does not "point out specifically the portion of the warrant affidavit that is claimed to be false . . . ." *Franks*, 438 U.S. at 171. The Affidavit never asserts or implies that Irizarry had exclusive access to the trash bins. In fact, it explains that 739 Quinnipiac Avenue is Vanessa Colon's residence, ECF No. 920-2 ¶ 22, a multi-family home, *id.* ¶ 4, and that some bins were "left on the curb," *id.* ¶ 25. Because Irizarry does not identify any specific statement or omission intended to mislead Magistrate Judge Spector, there is nothing for the Court to analyze under *Franks*.

*9. Hand-to-Hand Transactions*

Finally, Irizarry argues that two hand-to-hand transactions described in the Affidavit are "unrelated, uncorroborated, undocumented, and unprovable incidents," included "to mislead the Court into believing there was sufficient cause when there wasn't." ECF No. 920-1 at 19–20. But "[a] Defendant's challenge of a warrant 'must be more than conclusory and must be supported by

more than a mere desire to cross-examine.'" *Sandalo*, 70 F.4th at 85 (quoting *Franks*, 438 U.S. at 171). Irizarry's disagreement with the conclusion reached by agents who were surveilling him at the time of these transactions is not a showing of proof of falsity. Nor were the two alleged hand-to-hand transactions inappropriately conflated in the Affidavit. Thus, Irizarry's arguments with respect to these portions of the Affidavit fail to demonstrate that Officer Rasile made statements with reckless disregard for the truth, let alone with knowledge of their falsity.

C. The Hypothetical Affidavit

As discussed above, the Court finds that none of the alleged statements or omissions Irizarry has identified are false, misleading, or evince reckless disregard on the part of Officer Rasile. Thus, the Court need not engage in the exercise of analyzing a hypothetical corrected affidavit.

In any event, for the reasons the Government has argued in its opposition brief, none of the statements or omissions—taken individually or even collectively—would disturb the Magistrate Judge's probable cause determination if omitted (or, in the case of omissions, included). Indeed, probable cause is defined as a "fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Judge Spector's probable cause determination concerning the BMW was amply supported by the evidence detailed in the Affidavit, and the alleged misstatements and omissions would not have detracted from this finding, given the Affidavit's descriptions of the controlled purchase on February 24, 2023; the hand-to-hand transactions occurring from and around the BMW in June and August of 2023; the surveillance of Irizarry driving the BMW to 86 Woosley Street in June of 2023; and the August 2023 trash pulls at 739 Quinnipiac Avenue containing residue that field-tested positive for narcotics.

Accordingly, the Court denies Irizarry's motion to suppress, denies his request for a *Franks* hearing, and need not reach the question of whether the good faith exception to the warrant requirement applies here. *See Frazier*, 2020 WL 6263312, at *2.

## IV. CONCLUSION

For the reasons described herein, Defendant's motion for a *Franks* hearing and motion to suppress is DENIED.

**SO ORDERED** at Hartford, Connecticut, this 1st day of September, 2026.

*/s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE